UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

JOHN ALEXANDER ZAPATA
HINCAPIE,

      Plaintiff,

v.                                                                    No. 5:23-CV-299-H

TEXAS TECH UNIVERSITY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

In this case, the plaintiff, John Alexander Zapata Hincapie, asserts that he faced discrimination based on his race and national origin in violation of Title VII of the Civil Rights Act of 1964 during his time as a PhD student and instructor at Texas Tech. Specifically, Zapata claims that his PhD advisor imposed a discriminatory academic workload on him, which forced him to resign from his instructor position and that he faced disparate treatment in the terms of his employment at Texas Tech. Zapata also alleges that, when he complained of the discriminatory academic requirements imposed on him, Texas Tech retaliated against him in various academic- and employment-related ways.

Before the Court is the defendant's motion to dismiss the plaintiff's complaint. Dkt. No. 10. The defendant argues that all of Zapata's claims should be dismissed for failure to either timely exhaust administrative remedies or state a claim for relief. The Court grants in full the motion to dismiss. The constructive-discharge and disparate-treatment claims fail for failure to timely exhaust administrative remedies, and the retaliation claim fails to state a plausible claim for relief. The constructive-discharge claim is dismissed with prejudice, and the disparate-treatment and retaliation claims are dismissed without prejudice.

1.      **Factual and Procedural Background**

    A.      **Factual Allegations**

Zapata previously filed a case under Title VI in this Court, and the vast majority of the factual allegations in the instant complaint are largely identical to the allegations in that complaint, except for Section IV.H of the instant complaint, which concerns "Unequal and Discriminatory Treatment as an Instructor in the Department." *See* Dkt. No. 1 ¶¶ 139–65; *see also Zapata v. Texas Tech Univ. ("Zapata I")*, No. 5:23-CV-045-H, 2024 WL 1054650 (N.D. Tex. Mar. 11, 2024) (Hendrix, J.).  Because Zapata did not receive a right-to-sue letter from the EEOC until after he filed his complaint and the defendants brought a motion to dismiss in *Zapata I*, Zapata claims it was more efficient to file a new Title VII lawsuit.  Dkt. No. 18 at 4 n.1; *see also* Dkt. No. 4 at 2.  However, Zapata admits "he filed a very similar complaint" in this case compared to the *Zapata I* complaint (Dkt. No. 18 at 4 n.1), and he did not remove allegations that were relevant to his Title VI claims but that are irrelevant to his Title VII claims.  Although the relevant portions are covered below, the allegations in the *Zapata I* complaint are also summarized in the Court's Memorandum Opinion and Order in *Zapata I*.  *See* 2024 WL 1054650, at *1–3.

As relevant to Texas Tech's motion to dismiss here, Zapata was a PhD student in Texas Tech's chemical engineering department from Fall 2016 until Fall 2021, when he graduated with his doctoral degree.  Dkt. No. 1 ¶¶ 10, 134.  During that time, he asserts that he was discriminated against on the basis of race (Hispanic) and national origin (Colombian) through disparate application of a policy requiring PhD candidates to have two publications before graduating and through the number of corrections his PhD advisor (Dr. Simon) and PhD approver (Dr. Weeks) imposed on him.  *Id.* ¶¶ 49–51.  Near the end of

his time as a student, on or around March 12, 2021, Zapata was offered a job at Texas Tech as part of a spousal/partner accommodation after his girlfriend was offered a professorial position at Texas Tech.  Dkt. No. 1 ¶¶ 140–42.  On March 24, 2021, Zapata met with the chair of the chemical engineering department, Dr. Botte, to discuss the job duties and the department's needs.  *Id.* ¶ 145.  During this meeting, Dr. Botte told Zapata that he would be given a laptop and would either teach two classes in each of the fall and spring semesters or teach two classes during one semester and one laboratory class during the other.  *Id.*  About a month after this meeting, Dr. Botte told Zapata that the appointment would begin on August 18, 2021, but stated that she was still preparing his appointment paperwork.  *Id.*  On June 21, 2021, she asked for Zapata's curriculum and references so she could put his official offer letter together.  *Id.*

On July 22, 2021, Dr. Botte sent Zapata his letter of appointment, which was approximately 133 days after the department's initial agreement to hire Zapata as an instructor.  *Id.* ¶ 146.  However, this letter of appointment noted that Zapata would need to teach two to three classes per semester, which "eventually transformed into an assignment" to teach three classes per semester, which would make Zapata the faculty member teaching the most classes within the department.  *Id.*  Zapata signed the letter of appointment on July 23, 2021.  *Id.* ¶ 147.

Zapata alleges that the department granted spousal/partner accommodations and letters of appointment faster for Asian recipients of the accommodation than the 133 days it took for him and that those recipients had lighter teaching loads.  *Id.* ¶ 153.  In addition, Zapata points to two other recipients of spousal/partner accommodations who were Asian and were given accommodation positions as assistant professors.  *Id.* ¶ 154.  In contrast,

Zapata was given an instructor position, which is "less permanent, with a higher load of teaching responsibilities, and likely with less payment." *Id.* Zapata also points to two other recipients of spousal/partner accommodations who were Asian, one of whom was given a research assistant professor position, which is a higher-ranking position than instructor. *Id.* ¶ 155. The other received the same instructor position, under the same department chair as Zapata, but with an initial teaching load of two classes per semester. *Id.* These four recipients of a spousal/partner accommodation were listed as faculty members on the department's website, whereas Zapata was not. *Id.* ¶ 156. Zapata alleges that "[t]he department has a history of not properly recognizing Hispanic faculty members on its website but leaving on the website former Asian faculty members that are not associated with the Department." *Id.* ¶ 157. Zapata asserts that this shows "significant differential treatment of Hispanic and Asian faculty members both with respect to job offers and the conditions of employment." *Id.*

Zapata's employment within the department began on August 18, 2021. *Id.* ¶¶ 145, 161. His contract provided for employment for two years as an instructor. *Id.* ¶ 148. Zapata was assigned to a shared office with two other instructors after his job began, even though private offices were available. *Id.* ¶ 158. Zapata was given his own office approximately one month after the fall semester began, but that office was dirty and was never "conditioned or cleaned" during his employment despite Zapata's requests to the department for cleaning. *Id.* ¶ 160. Zapata alleges that, in contrast, four Asian recipients of a spousal/partner accommodation received private offices shortly after they were hired and that those offices were not unclean like his was. *Id.* ¶¶ 158, 160. In addition, Zapata alleges that the four Asian recipients of spousal/partner accommodations were given laptops or

computers, whereas Zapata did not receive one during his time as an instructor, despite asking for one numerous times. *Id.* ¶ 159.

On August 24, 2021, after Zapata requested clarification about the two-publications policy, the graduate committee informed Zapata what that policy required of him in order to graduate. *Id.* ¶ 97. Zapata alleges that the "Graduate Committee took this step in retaliation for [his] complaints about [his] past discrimination." *Id.* Then, in September 2021, Zapata corresponded with the dean of the graduate school, Dr. Sheridan, and the dean of the college of engineering, Dr. Sacco, with complaints about the continued requests for corrections to his dissertation and the two-publications requirement. *Id.* ¶¶ 75–77. On September 27, 2021, Zapata alleges that Dr. Sacco sent Zapata a "retaliatory email" stating that Zapata needed "to get [his second] paper accepted for you to be graduated . . . I thought when we met you agreed to do this? If this is not the case, please let me know for [it] has an impact on my agreement to help with your appointment as a spousal accommodation." *Id.* ¶ 104.

Later, on October 14, 2021, Zapata filed a grievance at Texas Tech with Dr. Sheridan "due to the possibility of losing his job as a result of his complaints about Dr. Simon's behavior and the unequal treatment of the 'two publications' policy, the ever-expanding list of dissertation 'corrections' sent by Dr. Simon, and Texas Tech's refusal to help him resolve this matter." *Id.* ¶ 78. In addition, on October 20, 2021, Zapata emailed Drs. Simon, Weeks, Sheridan, Sacco, and Botte communicating that he had filed a grievance, describing its contents, and explaining "the disparity of treatment with respect to other students, as well as the effect of Dr. Simon's intentional and discriminatory tactics on his current job and international status." *Id.* ¶ 79.

Zapata submitted his resignation from his position on October 25, 2021, effective November 8, 2021.  *Id.* ¶ 148.  Zapata resigned due to the work associated with obtaining his PhD degree, which was continuing at the time he undertook his employment.  *Id.*  As a result of his resignation, Zapata lost his health insurance coverage and was required to find a different job within 90 days or risk losing his legal immigration status.  *Id.* ¶ 149.  Zapata's dissertation was finally approved on November 12, 2021.  *Id.* ¶ 150.  Zapata alleges that because the dissertation approval occurred after his resignation became effective, he could not reverse his resignation before it became effective; he also alleges that he "offered to continue his duties as an instructor after a professor offered to help him with his dissertation efforts in exchange" but that this offer was rejected by Dr. Botte, thus forcing his resignation to become effective on November 8, 2021.  *Id.*

After Zapata's resignation, the associate dean of research and graduate programs, Dr. Weeks, went to one of the classes Zapata previously taught on November 11, 2023, and referred to him as a "terrorist" in front of Zapata's previous students, which Zapata alleges was "presumably as a form of retaliation against [him] for his efforts to protect his rights and to ensure the fairness of Texas Tech's processes and procedures."  *Id.* ¶ 85.  In addition, the department did not initially pay Zapata his full wages owed for his term of employment.  *Id.* ¶ 161.  Instead, Zapata was compensated for work performed from September 1, 2021, to November 8, 2021.  On December 17, 2021, after "repeatedly asking for the wage discrepancy to be fixed," Zapata received the full amount of wages owed to him, from August 18, 2021, to November 8, 2021.  *Id.*  Zapata alleges that this delay in paying his wages was "retaliatory action[] . . . motivated by [his] multiple complaints to be treated equally to his Asian peers" within the department and the college of engineering.  *Id.*

In addition, Zapata had previously requested—and Texas Tech had approved—his girlfriend to be his "hooding" professor at the graduation ceremony. *Id.* ¶ 42. Zapata also planned to propose to his girlfriend during the ceremony. *Id.* However, around December 3, 2021, Dr. Sheridan emailed Zapata to inform him that his girlfriend would no longer be permitted to be his hooding professor at the ceremony. *Id.* ¶ 111. Then, during an in-person meeting between Dr. Sheridan and Zapata on December 6, Dr. Sheridan informed Zapata that he would not be permitted to propose to his girlfriend at the ceremony. *Id.* ¶ 112.

Zapata also alleges that he is currently being denied a Master of Science degree, which he "could have obtained . . . since the Fall [of] 2018, if Dr. Simon had followed the Department's written policies and had given [him] the qualifying exam within a two-year framework." *Id.* ¶ 138. Although Zapata graduated from the PhD program in the fall of 2021, he requested that he be conferred an MS degree in August and September of 2022, at which time the college of engineering informed him that they would not grant him an MS degree because "a degree cannot be conferred retroactively." *Id.* ¶¶ 134–36. Zapata alleges that he had no way to know that he could have requested the degree during his studies and that the chemical engineering department only informed Asian students of this opportunity, leaving him and "most PhD students" in the department unable to obtain this degree. *Id.* ¶ 137. Zapata asserts that the continuing denial of an MS degree is due to discrimination and retaliation by Texas Tech. *Id.* ¶ 167. Finally, Zapata alleges that throughout the summer and fall of 2021, Dr. Simon retaliated against him by delaying the publication process for various chapters of his dissertation starting at least by August 30, 2021. *Id.* ¶¶ 72, 118–19.

### B.    Procedural History

Zapata filed a charge of discrimination with the EEOC on August 31, 2022.  Dkt. No. 1 ¶ 166; Dkt. No. 12 at 2.  The EEOC issued a right-to-sue letter on September 14, 2023.  Dkt. No. 1 ¶ 166.

Zapata filed the instant complaint naming Texas Tech as a defendant and alleging discrimination under Title VII of the Civil Rights Act of 1964.  *Id.* ¶ 1.  Texas Tech filed a motion to dismiss Zapata's complaint for lack of jurisdiction and failure to state a claim on May 17, 2024.  Dkt. Nos. 10–12.  Zapata filed a response to the motion to dismiss (Dkt. No. 18), and Texas Tech replied (Dkt. No. 19).  The motion is ripe for review.

### 2.    Legal Standard for Motions to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Therefore, a plaintiff must allege sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  A plaintiff's claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  If a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

Defendants can challenge the sufficiency of a complaint through a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  In resolving a motion to dismiss, a court

must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (cleaned up) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)). However, this tenet does not extend to legal conclusions. *Iqbal*, 556 U.S. at 678. Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Finally, administrative exhaustion in appropriately analyzed under Rule 12(b)(6). "Exhaustion of administrative remedies," such as filing a charge with the EEOC, "is a statutory condition precedent to maintaining a Title VII action in district court, not a jurisdictional prerequisite." *Barnes v. 7-Eleven Inc.*, No. 3:23-CV-01019-E, 2024 WL 628014, at *3 (N.D. Tex. Feb. 14, 2024) (citing *Pinkard v. Pullman–Standard, Inc.*, 678 F.2d 1211, 1218–19 (5th Cir. Unit B 1982) (per curiam)); *see also King v. Life Sch.*, 809 F. Supp. 2d 572, 577 (N.D. Tex. 2011). Because the timely filing of an EEOC charge is a condition precedent rather than jurisdictional, failure to timely exhaust administrative remedies "is subject to dismissal under Rule 12(b)(6)" rather than under Rule 12(b)(1). *Barnes*, 2024 WL 628014, at *3 (collecting cases).

### 3.    Analysis

The Court grants the defendant's motion to dismiss (Dkt. No. 10). Each of Zapata's claims fails because he has either failed to timely exhaust administrative remedies or failed to state a plausible claim for relief.

### A.    Failure to Timely Exhaust Administrative Remedies

"The timely filing of a charge with the EEOC is a prerequisite to maintaining a Title VII action." *Howe v. Yellowbook, USA*, 840 F. Supp. 2d 970, 976 (N.D. Tex. 2011) (first

citing *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 555 n.4 (1977); and then citing *Price v. Choctaw Glove & Safety Co., Inc.,* 459 F.3d 595, 598 (5th Cir. 2006)). Administrative "[e]xhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002). In Texas, this means that "the charge must be filed within 300 days after the alleged unlawful practice occurred." *Garrett v. Judson Indep. Sch. Dist.*, 299 F. App'x 337, 343 (5th Cir. 2008).

When considering whether an EEOC charge raises a particular claim—and therefore whether the plaintiff administratively exhausted that claim—a court is required to "'construe[] an EEOC complaint broadly,' but . . . only find a claim was exhausted if it could have been 'reasonably . . . expected to grow out of the charge of discrimination.'" *Jefferson v. Christus St. Joseph Hosp.*, 374 Fed. App'x 485, 490 (5th Cir. 2010) (quoting *McClain v. Lufkin Indus.*, 519 F.3d 264, 273 (5th Cir. 2008)). In making this determination, the court may consider the administrative charge and "look slightly beyond its four corners, to its substance rather than its label." *Pacheco v. Mineta*, 448 F.3d 783 (5th Cir. 2006) (citations omitted).

The defendant argues that the plaintiff's claims are barred because he failed to timely exhaust his administrative remedies. *See* Dkt. No. 11 at 15–16. In particular, the defendant argues that all of the plaintiff's claims began to accrue on October 25, 2021, which is outside of the applicable statute of limitations. *Id.* The Court agrees with the defendant that the plaintiff failed to timely exhaust his administrative remedies for his constructive-discharge and disparate-treatment claims, but not for his retaliation claim, which is timely.

### i.    Constructive-Discharge Claim

The Court grants the motion to dismiss with respect to the constructive-discharge claim because Zapata did not file his constructive-discharge claim in his charge with the EEOC within the statute of limitations.  The Supreme Court ruled in *Green v. Brennan*, 578 U.S. 547 (2016), "that a constructive discharge claim accrues—and the limitations period begins to run—when the employee gives notice of his resignation, not on the effective date of that resignation."  *Id.* at 564.  Taking the complaint's allegations as true, Zapata gave notice of his resignation on October 25, 2021, to become effective November 8, 2021.  Dkt. No. 1 ¶ 148.  As a result, under *Green*, the 300-day statute of limitations began to run on October 25, 2021.  However, his EEOC charge was not filed until August 31, 2022—310 days after his notice of resignation.  *Id.* ¶ 166; Dkt. No. 12 at 2.  Notably, neither Zapata nor Texas Tech cited to *Green* as controlling authority on the accrual of a constructive-discharge claim.  *See generally* Dkt. Nos. 11; 18; 19.

Zapata urges that his letter of resignation "has no relevance for" the statute-of-limitations calculation and is "entirely irrelevant to the limitations analysis."  Dkt. No. 18 at 22–23.  Instead, he argues it is Texas Tech's actions (rather than Zapata's own actions in submitting the letter of resignation) that bear on the statute-of-limitations analysis.  *Id.* Zapata's position is obviously and directly foreclosed by *Green*.  As Justice Alito's concurrence pointed out, *Green* set forth a "bright-line limitations rule for constructive discharge claims."  578 U.S. at 565 (Alito, J., concurring).  Thus, the 300-day limitations period on his constructive-discharge claim started running on October 25, 2021, and his EEOC charge filed 310 days later is untimely.

Fifth Circuit caselaw also supports this conclusion. For example, in *Melgar v. T.B. Butler Publishing Company*, 931 F.3d 375 (5th Cir. 2019), the Fifth Circuit affirmed dismissal of Title VII claims for "fail[ure] to properly exhaust [the plaintiff's] administrative remedies" where the plaintiff filed an untimely EEOC charge. *Id.* at 382. Similarly, in *Ganheart v. Brown*, 740 Fed. App'x 386 (5th Cir. 2018), the Fifth Circuit affirmed that dismissal for failure to exhaust administrative remedies was proper where the adverse employment actions on which a claim was based took place "more than 300 days before [the plaintiff] filed her EEOC charge . . . ." *Id.* at 390. And in the analogous context of the limitations period for commencing a Title VII suit following receipt of a right-to-sue letter from the EEOC, the Fifth Circuit has recognized that it "routinely dismisses untimely claims" and affirmed dismissal of a suit that was filed approximately one month after the limitations period. *Garcia v. Penske Logistics, LLC*, 631 F. App'x 204, 208 (5th Cir. 2015).[1] Here, even construing Zapata's complaint in the light most favorable to him, Zapata alleges that his EEOC charge was filed more than 300 days after his constructive-discharge claim accrued. *See* Dkt. No. 1 ¶ 166. The constructive-discharge claim is therefore dismissed for failure to timely exhaust administrative remedies.

---

[1] Accordingly, district courts within the Fifth Circuit similarly have dismissed claims where the plaintiff filed an EEOC charge only days or a few weeks late. *See, e.g.*, *Sambrano v. United Airlines, Inc.*, 707 F. Supp. 3d 652, 675 (N.D. Tex. 2023), *reconsideration denied*, 347 F.R.D. 155 (N.D. Tex. 2024) (dismissing Title VII claims where the charge was filed 23 days late); *see also Byars v. Asbury Mgmt. Servs., LLC*, No. 3:19-CV-660-KHJ-MTP, 2022 WL 468598, at *3 (S.D. Miss. Feb. 15, 2022) (dismissing constructive-discharge claim where the charge was filed seven days late); *Jarvis v. Texas*, No. CV H-18-1463, 2019 WL 2453162, at *2 (S.D. Tex. Apr. 9, 2019), *report and recommendation adopted sub nom. Jarvis v. Gen. Land Off. of Tex.*, No. CV H-18-1463, 2019 WL 2448629 (S.D. Tex. June 11, 2019) (dismissing constructive-discharge claim where the charge was filed 32 days late).

###### ii.    Disparate-Treatment Claim

Zapata makes various allegations of specific actions taken by Texas Tech in which he was treated differently than similarly situated Asian peers, all of which took place outside of Zapata's 300-day EEOC charge period.  As a result, the Court dismisses Zapata's disparate-treatment claim.

First, Zapata's sole cause of action states that he is bringing a "Race [and] National Origin Discrimination" claim, and Zapata expressly references constructive discharge.  Dkt. No. 1 at 60–61.  However, reading the complaint in the light most favorable to the plaintiff, the Court construes Zapata's complaint as also bringing a disparate-treatment claim. Zapata's allegation within his "Cause of Action" section alleges that Texas Tech discriminated against him by providing "unequal terms of employment as compared to similarly situated Asians in the Department."  Dkt. No. 1 ¶ 170.  In addition, Zapata makes repeated allegations as to how Texas Tech's treatment of him was different than the treatment of his Asian peers.  *See id.* ¶¶ 151–60.  On the other hand, Zapata has not "allege[d] conduct so severe or pervasive as to alter the conditions of [his] employment and thus create an abusive working environment."  *Corrica v. Am. Airlines*, No. 3:20-CV-0679-B, 2021 WL 632728, at *3 (N.D. Tex. Feb. 18, 2021) (citing *Ransey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).  Zapata's allegations, read in the light most favorable to him, indicate he has brought a disparate-treatment claim based on race and national origin, which requires that a plaintiff "allege . . . facts, direct or circumstantial, that would suggest [the defendant's] actions were based on [the plaintiff's] race or national origin or that [the defendant] treated similarly situated employees of other races or national origin more favorably."  *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013).

Second, the continuing-violation doctrine does not apply to Zapata's disparate-treatment claim.  Zapata argues that the "discriminatory actions" that form the basis of his discrimination claim—such as having a greater teaching load or being denied a laptop—"continued throughout [his] employment" and therefore only ended on November 8, 2021, when his resignation became effective.  Dkt. No. 18 at 24.  As the defendant points out (*see* Dkt. No. 11 at 16), Zapata appears to be urging application of the continuing-violation doctrine, which "provides that when a plaintiff alleges a hostile work environment claim, as long as an employee files her complaint while at least one act which comprises the hostile work environment claim is still timely, the entire time period of the hostile environment may be considered by a court for the purpose of determining liability."  *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 736 (5th Cir. 2017), *as revised* (Mar. 13, 2017) (internal quotation marks and citation omitted).

However, the continuing-violation doctrine does not apply to claims based on discrete discriminatory acts, such as Zapata's discrimination claim here.  *See id.* at 741; *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009).  Instead, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice," and the plaintiff can only bring a claim based on acts that occurred within the limitations period.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  As the Fifth Circuit has cautioned, the continuing-violation doctrine should not be confused "with a single violation followed by continuing consequences."  *Brown v. City of Cent.*, No. 23-30146, 2024 WL 546340, at *6 (5th Cir. Feb. 12, 2024) (quoting *McGregor v. La. State Univ. Bd. of Sup'rs*, 3 F.3d 850, 867 (5th Cir. 1993)).  Thus, even events that may have consequences that continue to affect employment conditions,

such as a "pay-raise exclusion" or "denials of weekend overtime"—or, for example, the increased workload at issue here—"qualify as such discrete acts." *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 349 (5th Cir. 2010) (citation omitted).

Under Title VII, "the operative date from which the limitations period begins to run is the date of notice of the adverse action, not the date that the adverse action takes effect." *Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 287 (5th Cir. 2008). Here, it is clear from the face of the complaint that the adverse actions alleged by Zapata did not take place on or after November 4, 2021—that is, within 300 days before Zapata filed an EEOC charge on August 31, 2022. In particular, Zapata makes the following allegations of disparate treatment in his employment:

- The department made formal offers of spousal/partner accommodations faster for Asian recipients[2] than for him. Dkt. No. 1 ¶ 153.

- He was given a lower-ranking position (that had a higher workload) than similarly situated Asian recipients of the spousal/partner accommodation. *Id.* ¶ 154.

- He was given a higher workload than similarly situated Asian recipients of the spousal/partner accommodation in the same position as him. *Id.* ¶ 155.

- Asian recipients of the spousal/partner accommodation were listed on the department website as faculty upon their hiring or during their employment, whereas Zapata was not. *Id.* ¶¶ 156–57.

---

[2] The complaint indicates that three of these Asian recipients of spousal/partner accommodations had been hired either before or contemporaneously with Zapata's hiring, and one received an accommodation after Zapata resigned from his position and graduated from his PhD program. Dkt. No. 1 ¶ 152.

- He was originally assigned a shared office, whereas Asian recipients of the spousal/partner accommodation were given private offices shortly after being hired. *Id.* ¶ 158.

- When he was given his own office, it was dirty and never cleaned despite his requests, which did not happen to the Asian recipients of the spousal/partner accommodation. *Id.* ¶ 160.

- The four Asian recipients of a spousal/partner accommodation were given laptops or computers, whereas Zapata did not receive a laptop or computer during his time as an instructor, despite asking for one numerous times. *Id.* ¶ 159.

Zapata alleges that these actions were "unequal terms of employment" that "constituted an adverse employment action and ultimately led to [his] forced resignation." *Id.* ¶¶ 170–71. Zapata further alleges that these actions caused his "working conditions [to] become so intolerable that [he] felt compelled to resign." *Id.* ¶ 171.[3]

---

[3] Zapata's motion-to-dismiss response also notes that he did not receive final approval of his dissertation until November 12, 2021, or receive confirmation of his graduation until December 9, 2021. Dkt. No. 18 at 23. Zapata appears to cite these events in support of his argument that his constructive-discharge claim is timely. As discussed in Analysis § 3.A.i, *supra*, this argument fails under prevailing Supreme Court precedent. To the extent that Zapata cites to these events in support of his disparate-treatment claim, an adverse employment action must concern "discrimination in hiring, firing, compensation, or the 'terms, conditions, or privileges' of her employment." *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 497 (5th Cir. 2023). While the adverse action need not be an "ultimate employment decision," it must relate to the employment relationship or the benefits of employment. *Id.* at 501–02. These allegations concern discrimination in the course of his academic pursuits and indeed were analyzed as such in his first lawsuit, *see Zapata I*, 2024 WL 1054650, at *6, not in the course of his employment (such as discrimination in shift scheduling or paying job-related fees). *See, e.g.*, *Hamilton*, 79 F.4th at 503–04 (determining that the "days and hours that one works" fall within the terms or conditions of employment); *Harrison v. Brookhaven Sch. Dist.*, 82 F.4th 427, 431 (5th Cir. 2023) (determining that payment by an employer of job-training program fees "c[ould] also be construed as a 'benefit'" within the meaning of terms, conditions, and privileges of employment).

– 16 –

Taking the well-pled allegations as true and viewing the facts in the light most favorable to Zapata, it is clear that these actions occurred before November 4, 2021. Specifically, Zapata received his allegedly delayed letter of appointment on July 22, 2021. *Id.* ¶ 146. He also received an email informing him of an increased teaching workload on July 22, 2021. *Id.* The department agreed to hire Zapata in the instructor position on March 12, 2021, and he signed his letter of appointment detailing the terms of that position on July 23, 2021. *Id.* ¶¶ 142, 147. Zapata started his job on August 18, 2021 (*id.* ¶ 66), and at that time was given a shared office (*id.* ¶ 158) but was not placed on the department's website (*id.* ¶¶ 156–57) or given a laptop (*id.* ¶ 159) on or after this time. He received his own allegedly dirty office "more than one month after the Fall 2021 semester classes had already started" (November 4, 2021 was over two months after the semester began). *Id.* ¶ 160.

Finally, Zapata alleges that each of the "unequal terms of [his] employment" addressed above was "an adverse employment action" that "ultimately led to [his] forced resignation" (*id.* ¶ 171)—an event he alleges took place on October 25, 2021 (*id.* ¶ 83). When considering a motion to dismiss, "[t]he court's inquiry should focus on the complaint as a whole, 'regardless of how much of it is discussed in the motion to dismiss.'" *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 321 (5th Cir. 2016) (quoting *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012)). Considering all of Zapata's allegations as true, the complaint taken as a whole necessarily pleads that Zapata had notice of these adverse actions before November 4, 2021. The complaint does not give a specific date regarding the allegations regarding laptops and his non-listing on the website. Dkt. No. 1 ¶¶ 156, 159. But Zapata alleges in his complaint that these actions are part of the adverse employment

action that caused him to resign on October 25, 2021—that is, before November 4, 2021.  *Id.* ¶ 171; *see also* Dkt. No. 18 at 24 (noting that paragraphs 152 through 160 of the complaint present the alleged discriminatory employment actions that took place throughout the plaintiff's employment).  Because these actions, as alleged in the current complaint, took place outside the limitations period, they are untimely and cannot form the basis of Zapata's disparate-treatment claim.  The Court therefore dismisses Zapata's disparate-treatment claim.

### iii.    Retaliation Claim

Unlike the preceding claims, Zapata's retaliation claim is timely, in part, because it is based on events that took place after November 4, 2021.  A retaliation claim accrues, and the statute of limitations begins to run, when each discrete act of retaliation occurs.  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 105.  Here, Zapata alleges that several instances of retaliation took place on or after November 4, 2021.  Therefore, those instances took place within the 300-day limitations period before his EEOC charge was filed.

First, Zapata alleges that Dr. Weeks retaliated against him by referring to him as a "terrorist" in front of Zapata's previous students on November 11, 2021.  Dkt. No. 1 ¶ 85.  Second, Zapata alleges that, after his resignation became effective November 8, 2021, the department did not initially pay him full wages owed for his term of employment.  Dkt. No. 1 ¶ 161.  Instead, Texas Tech paid him for work performed beginning on September 1, 2021, rather than on August 18, 2021.  *Id.*  Zapata received full pay on December 17, 2021.  *Id.*  Third, Zapata alleges that, in early December 2021, Texas Tech retaliated against him by reversing its decision to let his girlfriend be his "hooding" professor at his graduation and informing him he could not propose to his girlfriend at his graduation ceremony.  Dkt. No.

1 ¶¶ 111–12.  Finally, Zapata alleges that he is currently being denied a Master of Science degree, a request he initially made in late August 2022 that was denied in "mid-September 2022" and again on September 19, 2022.  *Id.* ¶¶ 136–38.  Each of these involves an alleged act of retaliation that occurred after November 4, 2021, and the Court will therefore proceed to determining whether Zapata has alleged a viable retaliation claim based on these actions.

Zapata also alleges several retaliatory actions occurring before November 4, 2021—and in fact, before his complaint of discrimination on October 20, 2021—that are therefore untimely.  In particular, he alleges that on August 24, 2021, the graduate committee retaliated against him by imposing discriminatory criteria for meeting the two-publications policy.  *Id.* ¶ 97.  He further alleges that, starting August 30, 2021, Dr. Simon began delaying his ability to publish chapters of his dissertation by sending additional dissertation edits.  *Id.* ¶ 72, 118–19.  And he alleges that Dr. Sacco, the dean of the college of engineering, sent him a retaliatory email on September 27, 2021, in which he told Zapata that failure to comply with the two-publications requirement could impact his spousal/partner accommodation.  *Id.* ¶ 104.  These all fall outside the limitations period and therefore will not be permitted to proceed as bases of Zapata's retaliation claim.[4]

### B.    Pattern-or-Practice Claim

Pattern-or-practice claims of discrimination differ from disparate-treatment claims in that, rather than consisting of "isolated or sporadic discriminatory acts by the employer," a plaintiff instead must ultimately establish that "discrimination was the company's standard

---

[4] In addition, each of these actions took place before Zapata complained of discriminatory treatment on October 20, 2021.  A retaliatory action must occur after protected activity occurred to be actionable.  *See Davis v. Dall. Indep. Sch. Dist.*, 448 F. App'x 485, 494 (5th Cir. 2011).  As a result, these events fail as a basis for Zapata's retaliation claim for that reason as well.

operating procedure—the regular rather than the unusual practice." *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000) (quoting *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875–76 (1984)). The Fifth Circuit has held that a "pattern and practice" theory is inapplicable when a plaintiff brings an individual claim of discrimination. *See Roy v. U.S. Dep't of Agri.*, 115 F. App'x 198, 201 (5th Cir. 2004); *see also* citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001).

The Court does not construe Zapata's complaint as attempting to state a pattern-or-practice discrimination claim. The defendant argues in its reply brief that Zapata "cannot properly articulate any separate and distinct claim based upon a pattern and practice of discrimination" because "[h]e is making an individual claim of discrimination" and "has pled no class action claims." Dkt. No. 19 at 5. However, Zapata's complaint is brought only on behalf of himself. *See generally* Dkt. No. 1. The factual allegations in Zapata's EEOC charge also concern only allegations of differential treatment between Zapata and other employees in the department on the basis of Zapata's race and national origin. *See* Dkt. No. 18-1 at 3–5. And Zapata's motion-to-dismiss response does not make any argument that Zapata has brought a claim on behalf of a class or is seeking relief based on anything other than discrimination against himself as an individual. *See generally* Dkt. No. 18; *see also id.* at 24 (claiming the defendant discriminated against Zapata in the course of "his employment").

The defendant's argument that Zapata has alleged a "pattern and practice" claim (Dkt. No. 19 at 3–5) hinges on Zapata's argument that he has alleged "a pattern of discrimination" in events such as denial of a laptop and giving him a shared office that "continued throughout [Zapata's] employment . . . ." Dkt. No. 18 at 24. But as discussed

in Analysis § 3.A.ii, *supra*, the Court has construed this argument in Zapata's response as one in support of the continuing-violation doctrine. And construing Zapata's complaint in the light most favorable to him, Zapata alleges a series of discriminatory acts directed towards himself individually to support his argument that he has filed a timely disparate-treatment claim. *See* Dkt. No. 18 at 24; *see also* Dkt. No. 1 at ¶¶ 152–60. As a result, the Court declines to construe Zapata's complaint, as the defendant proposes, as alleging a pattern-or-practice theory of discrimination within the context of Zapata's claim of individual discrimination. *See Roy*, 115 F. App'x at 201.

### C.    Zapata's Retaliation Claim

For Zapata's retaliation claim, while he need not plead a prima facie case of retaliation at the motion-to-dismiss stage, "[t]he prima facie standard nonetheless has some relevance at the motion-to-dismiss stage." *Jenkins v. La. Workforce Comm'n*, 713 F. App'x 242, 244 (5th Cir. 2017) (citations omitted). The prima facie elements of a retaliation claim, which are helpful to consider in analyzing the complaint's sufficiency, require a showing that (1) the plaintiff engaged in activity protected by Title VII, (2) an adverse employment action occurred, and (3) there is a causal connection between the plaintiff's participation in protected activity and the adverse employment action. *Id.* at 245. The Court dismisses this claim because Zapata has not alleged that he engaged in any protected activity under Title VII.

The defendant argues that Zapata's retaliation claim fails because he has not alleged that he engaged in activity protected by Title VII. Dkt. No. 11 at 21–22. An employee has engaged in protected activity if "he has opposed any practice made an unlawful employment practice . . . or [if] he has made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). An "unlawful employment practice," in turn, includes discrimination in hiring, firing, "compensation, terms, conditions, or privileges of employment," as well as "limit[ing] . . . employees or applicants for employment in any way which would tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." *Id.* § 2000e-2(a).

Here, while Zapata repeatedly alleges that he had questions regarding his treatment and complained of unfair treatment in the department, he does not indicate that he ever complained that unfair or discriminatory academic requirements were being applied to him based on his race and national origin until October 20, 2021. *See* Dkt. No. 1 ¶¶ 51, 75–77. The first and only time that Zapata alleges that he complained of discriminatory treatment was on October 20, when he emailed various professors after he filed his grievance. *Id.* ¶¶ 78–79. The October 20 email, therefore, is the only protected activity on which Zapata can base a retaliation claim.

In that email, Zapata complained of "unequal treatment of the 'two publications' policy, the ever-expanding list of dissertation 'corrections' sent by Dr. Simon, and Texas Tech's refusal to help him resolve this matter," as well as "the disparity of treatment with respect to other students and the effect of" the "discriminatory tactics" of his PhD advisor (who was no longer an employee of Texas Tech) on his current job. *Id.* With respect to the effect of this treatment on his job, Zapata alleges that as a result of his academic supervisors' and advisors' allegedly discriminatory actions, he was forced to resign from his instructor position to ensure he could fulfill his academic requirements. *Id.* ¶¶ 82, 148–49. And

notably, in Zapata's response to Texas Tech's motion to dismiss, Zapata does not dispute that he "submitted grievances due to [Texas Tech's] alleged discriminatory activities with respect to his educational endeavors rather than because of discrimination in his employment." Dkt. No. 18 at 27. Rather, he argues that his complaint regarding academic discrimination constitutes protected activity under Title VII. *Id.* at 27–28.[5]

Zapata's October 20 email is not protected activity within the meaning of Title VII. As relevant here, under Title VII, an employee engages in protected activity when he opposes an unlawful employment practice taken by an employer. 42 U.S.C. §§ 2000e-2(a), 2000e-3(a). But Zapata's email here did not complain of or oppose discrimination by Texas Tech in Zapata's employment; instead, he complained that his PhD advisors were discriminating against him in the course of education. In other words, although Zapata

---

[5] In an effort to argue that his various complaints related to discrimination in employment, Zapata argues that he alleges that Texas Tech gave him an unusually burdensome teaching load around the same time he was suffering from alleged academic discrimination, and that his "grievances thus related to both his education and his employment." Dkt. No. 18 at 28. However, while Zapata does allege that he was discriminated against because Texas Tech increased his teaching load (Dkt. No. 1 ¶ 146), he does not allege in his complaint that his October 20, 2021, email concerned this alleged employment discrimination (*see id.* ¶¶ 78–79). "To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And "[t]he court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). But a court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."). The grievance, October 20 email, and other emails in which he complained of unfair treatment are not attached to Zapata's complaint or his response to Texas Tech's motion to dismiss. The Court must thus rely on the complaint's factual allegations, not conclusory statements in Zapata's response. And construing the complaint in the light most favorable to Zapata, the complaint alleges that Zapata's grievance and email related to purely academic matters—the "two publications" requirement, the amount of comments on Zapata's dissertation, and "disparity of treatment with respect to other *students*." Dkt No. 1 ¶¶ 78–79 (emphasis added).

made a complaint relating to discrimination in education, there is no support in his allegations that this complaint "concerned the infraction of a right with redress under Title VII." *Smart v. Geren*, 350 F. App'x 845, 846 (5th Cir. 2008).

Title VII's retaliation protections do not guard against alleged adverse employment actions in retaliation for activity that is not "protected activity" under Title VII. For example, in *Smart*, the Fifth Circuit agreed that the filing of "unfair labor practices charges before being terminated" was not protected activity under Title VII, because there was no "indicat[ion] that the complaints concerned the infraction of a right with redress under Title VII." *Id.* at 846; *accord. Tucker v. Unitech Training Acad., Inc.*, 783 F. App'x 397, 400 (5th Cir. 2019) (determining that a "Title VII . . . retaliation claim[] fail[s]" because the plaintiff's complaints "are not protected activities under Title VII"). In another case, a graduate student/teaching assistant brought both Title VI and Title VII claims, including a Title VII retaliation claim alleging that his university threatened to remove him from the university in retaliation for a grievance regarding the plaintiff's comprehensive-exam grades. *Muthukumar Nachiappan Subbiah v. The Univ. of Tex. at Dall.*, No. 3:10-CV-115-B, 2011 WL 1771806, at *4–5 (N.D. Tex. May 10, 2011), *aff'd sub nom. Muthukumar v. Univ. of Tex. at Dall.*, 471 F. App'x 407 (5th Cir. 2012). The district court dismissed the claim because the plaintiff's allegations went to "conduct surrounding his failed comprehensive exam" rather than "his work as a teaching assistant," and "losing his teaching assistant position would be merely a tangential effect stemming from his removal as a student." *Id.* at *5. The Fifth

Circuit affirmed, agreeing that the plaintiff's allegations related to his retaliation claim "fail[ed] to establish a Title VII claim." *Muthukumar*, 471 F. App'x at 409.[6]

Other circuits have reached the same conclusion. For instance, in an analogous case, the Eighth Circuit determined that "Title VII simply does not protect" the complaint of a graduate teaching assistant regarding discrimination in academic activities, which were "about [his school] as a university, not about [his school] as an employer." *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137–38 (8th Cir. 2007); *see also Warren v. Kemp*, 79 F.4th 967, 974 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 1010 (2024) ("We have rejected Title VII retaliation claims where the plaintiff opposed conduct other than a discriminatory employment practice."); *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 167 (4th Cir. 2017) (affirming dismissal of Title VII retaliation claim because complaint regarding sex discrimination against students was not a protected activity under Title VII).

Zapata faces the same defect here. Here, Zapata's October 20 email, as reported in the allegations in the complaint and construed in the light most favorable to him, concerned his PhD advisor's alleged race and national-origin discrimination in the academic requirements imposed on him. The complaint does not allege that Zapata's October 20 email opposed actions by the defendant that were, or that Zapata believed, were

---

[6] As additional examples, in a similar case, an employee of an educational institution filed a report alleging not "racial discrimination in employment practices," but rather "discriminatory treatment of *students* based on race." *Ellis v. Midwest Tech. Inst., Inc.*, No. 3:20-CV-393-KHJ-LGI, 2021 WL 3612279, at *2 (S.D. Miss. Aug. 13, 2021) (emphasis in original). Because the report did not concern unlawful employment practices, the court dismissed, at the motion to dismiss stage, the plaintiff's retaliation claim because the plaintiff failed to allege that she engaged in protected activity. *Id.* Similarly, in *Dear v. Jackson State Univ.*, No. 3:07-CV-407-WHB-LRA, 2008 WL 4225766 (S.D. Miss. Sept. 10, 2008), the court determined that a report by a university employee regarding sexual harassment of a student was not protected activity under Title VII "because the alleged harassment reported by [the plaintiff] did not arise out of an employer/employee relationship (but instead arose out of a student/instructor relationship)." *Id.* at *7.

employment discrimination; instead, Zapata's motion-to-dismiss response disputes the legal sufficiency of his email rather than challenging that he "submitted grievances due to [the defendant's] alleged discriminatory activities with respect to his educational endeavors rather than because of discrimination in his employment." Dkt. No. 18 at 28.

This does not mean that Zapata has no actionable claim based on retaliation after his October 20 email or that the email is not protected activity under any circumstances. Indeed, Zapata previously brought the very same allegations of protected activity in his *Zapata I* complaint, arguing that he faced retaliation in the academic context. And this Court previously treated the same October 20 email as protected activity under the meaning of Title VI in evaluating Zapata's Title VI retaliation claim. *Zapata I*, 2024 WL 1054650, at *7. What it means is that Title VII is not the correct statute on which to base this retaliation claim, because "Title VII protects an employee only from 'retaliation for complaining about the types of discrimination [that Title VII] prohibits.'" *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 21 (5th Cir. 2020) (quoting *O'Daniel v. Indus. Serv. Sols.*, 922 F.3d 299, 307 (5th Cir. 2019)) (affirming dismissal of retaliation claim at motion to dismiss stage).

Zapata argues in rebuttal that he "alleges that Texas Tech overloaded him with so much work in inequitable and discriminatory fashion that he could not possibly continue his employment—thus limiting him in a way which would tend to deprive him and which did, in fact, deprive him of employment opportunities" as is made unlawful under 42 U.S.C. § 2000e-2(a)(2). Dkt. No. 18 at 28. In other words, Zapata argues that he engaged in protected activity under Title VII because (i) he made a complaint related to his academic workload, and (ii) this academic workload caused him to resign his employment, which means that Texas Tech's alleged academic discrimination ultimately led to an unlawful

employment action.  But regardless of whether Texas Tech's actions were an unlawful employment practice, the relevant question for Zapata's retaliation claim is not whether Texas Tech engaged in some unlawful employment practice, but whether Zapata's October 20 email opposed an unlawful employment practice and is therefore "protected activity" under Title VII.  As explained above, Zapata's email may be protected activity under other statutes—and could form the basis of a Title VI claim, as this Court previously permitted— but it is not protected activity under Title VII.  The Court therefore dismisses the retaliation claim.

### 4.    Conclusion

Zapata's Title VII complaint does not plausibly allege that he is entitled to relief.  His constructive-discharge and disparate-treatment claims were not timely exhausted.  His retaliation claim lacks any protected activity within the meaning of Title VII.  Accordingly, the Court grants the defendant's motion to dismiss (Dkt. No. 10).

Zapata's constructive-discharge claim is dismissed with prejudice, as the defect to that claim—that Zapata gave notice of his resignation outside of the 300-day limitations period—is straightforward and incurable.  *See Dillard v. Davis*, No. 7:19-CV-081-M-BP, 2021 WL 12191285, at *2 (N.D. Tex. Feb. 16, 2021) (citing *Avdeef v. Royal Bank of Scotland, PLC*, 616 F. App'x 665, 676 (5th Cir. 2015)).  As to the disparate-treatment and retaliation claims, Zapata did not request leave to amend—and defended the sufficiency of his allegations—in his motion-to-dismiss response.  However, he has not yet amended his complaint in this case, and Zapata could attempt to cure the defects in these claims through amendment to his complaint.  *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).  The Court will

therefore dismiss the disparate-treatment and retaliation claims without prejudice and with leave to amend.  *See id.*

Should Zapata attempt to cure the deficiencies identified in this Order, he must move for leave to amend—and attach the proposed amended complaint as an exhibit, as required by Local Civil Rule 15.1—no later than 21 days after this Order.  Otherwise, the Court will enter final judgment in accordance with Federal Rule of Civil Procedure 58 in a separate document.

So ordered on October 29, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE